**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

DAVID ANDREW WHITE,

      Petitioner,

v.                                                                          Case No. 8:14-cv-94-T-36MAP

SECRETARY, DEPARTMENT
OF CORRECTIONS,

      Respondent.

_____/

## ORDER

David Andrew White, a Florida prisoner proceeding *pro se*, filed a petition for writ of

habeas corpus under 28 U.S.C. § 2254. (Dkt. 1.) He challenges a judgment entered by

the Circuit Court for the Sixth Judicial Circuit, in and for Pasco County, Florida, in 2008.

In its response, Respondent agrees that the petition is timely. (Dkt. 20.) White filed a

reply. (Dkt. 32.) White's petition is due to be denied.

## PROCEDURAL HISTORY

A jury convicted White of one count of second degree murder. (Dkt. 25, Ex. 3.) The

trial court sentenced him to forty-six years in prison, with ten years suspended. (Dkt. 25,

Ex. 7.) The state appellate court *per curiam* affirmed the conviction and sentence. (Dkt.

25, Exs. 11, 12.) White filed a motion and amended motion for postconviction relief under

Florida Rule of Criminal Procedure 3.850. (Dkt. 25, Exs. 16, 18.) The state court

summarily denied relief. (Dkt. 25, Exs. 19, 21.) The state appellate court *per curiam*

affirmed the lower court. (Dkt. 25, Ex. 24.) White also filed a motion to correct illegal

sentence under Florida Rule of Criminal Procedure 3.800(a).  (Dkt. 25, Ex.  32.)  The state court denied his motion, and the state appellate court *per curiam* affirmed the order of denial.  (Dkt. 25, Exs. 33, 37.)

## FACTS[1]

Andrea White went missing on the night of July 11, 2005.  Her husband, Petitioner David White, told numerous family members and acquaintances that they got into an argument and she left their home that night.   The couple was known to have marital difficulties.  On July 12, White did not go to work, telling his boss that Andrea left and he was attempting to get custody of their daughters.  That day, Andrea's best friend, Desiree Patton, repeatedly attempted to call Andrea but could not reach her.  Concerned, Patton called White and went to the Whites' house.  White told her that Andrea, a diabetic, took her insulin with her when she left.  But when Patton looked inside Andrea's purse, which she had apparently left behind in the house, she saw Andrea's pouch of insulin and syringes.  In Patton's experience, Andrea never left home without insulin.   Andrea also noticed damp pillows in the laundry area.

Deputy Norman Gay of the Pasco County Sheriff's Office responded to the Whites' home that evening to perform a welfare check on Andrea.[2]  White told him that Andrea left on foot following the argument.  But, when Gay confronted him with Patton's statement that White told her Andrea left in a blue car, White agreed that he believed Andrea got into an unknown blue car.  White left for New York with his and Andrea's two daughters.  He

---

[1] This summary of the facts is derived from the trial transcript and direct appeal briefs.

[2] Before she left for the Whites' house, Patton called Andrea's sister Rhonda, stating that if she did not contact Rhonda again within fifteen minutes, Rhonda should call police.

stayed with family when he arrived there.

On July 14, Andrea White's body was found in a shallow retention pond near Cheltnam Court.  Her death was from homicidal violence of undetermined etiology.  The circumstances in which she was found–in a remote area, barefoot and wearing night clothes, and about five miles from her home–were crucial to this conclusion.  When her body was found, she likely had been dead for days.  Evidence suggested her body may have been in the water since the morning of July 12.[3]  Police learned that White, who had worked maintaining rental homes, had worked on a home on Cheltnam Court.

Detectives from the Pasco County Sheriff's Office arrived in New York on July 15.  White spoke to them in New York and agreed to return to Florida with them.  He gave an interview at the Sheriff's Office upon arriving in Florida.  Meanwhile, several of Andrea's family members had stayed at the house after Andrea's body was found.  White was arrested almost a year later, in June 2006, in New York.

## STANDARD OF REVIEW

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this proceeding. *Wilcox v. Florida Dep't of Corr.,* 158 F.3d 1209, 1210 (11th Cir. 1998), *cert. denied,* 531 U.S. 840 (2000).  Habeas relief can only be granted if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Section 2254(d), which sets forth a highly deferential standard for federal court review of a state court adjudication, states:

---

[3] A witness testified that while walking his dog at about 5:30 a.m. on July 12, he saw a large shape in the water.  He wondered whether this object was a body, but was unable to determine what it was due to the darkness at that hour.

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In *Williams v. Taylor,* 529 U.S. 362, 412-13 (2000), the Supreme Court interpreted this deferential standard:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied–the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal Law, as determined by the Supreme Court of the United States" or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

"The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable . . . an unreasonable application is different from an incorrect one."  *Bell v. Cone*, 535 U.S. 685, 694 (2002).  "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for

fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). *Accord Brown v. Head*, 272 F.3d 1308, 1313 (11th Cir. 2001) ("It is the objective reasonableness, not the correctness *per se*, of the state court decision that [the federal court is] to decide.").  The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.

The purpose of federal review is not to re-try the case.  "The [AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Cone*, 535 U.S. at 693.  In other words, "AEDPA prevents defendants–and federal courts–from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010).  *See also Cullen v. Pinholster,* 563 U.S. 170, 181 (2011) ("This is a 'difficult to meet,' . . . and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt' . . . .") (citations omitted).

The state appellate court affirmed the denial of White's postconviction motions in *per curiam* decisions without written opinions.  These decisions warrant deference under Section 2254(d)(1) because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore,* 278 F.3d 1245, 1254 (11th Cir.), *reh'g and reh'g en banc denied,* 278 F.3d 1245 (2002), *cert. denied sub nom. Wright v. Crosby,* 538 U.S. 906 (2003). *See also Richter,* 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that

the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

Review of the state court decision is limited to the record that was before the state court. *Pinholster,* 563 U.S. at 181-82. White bears the burden of overcoming by clear and convincing evidence a state court factual determination. "[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). This presumption of correctness applies to a finding of fact but not to a mixed determination of law and fact. *Parker v. Head*, 244 F.3d 831, 836 (11th Cir. 2001).

**EXHAUSTION OF STATE COURT REMEDIES; PROCEDURAL DEFAULT**

Before a district court can grant habeas relief to a state prisoner under § 2254, the petitioner must exhaust all state court remedies that are available for challenging his conviction, either on direct appeal or in a state postconviction motion. 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). *See also Henderson v. Campbell*, 353 F.3d 880, 891 (11th Cir. 2003) ("A state prisoner seeking federal habeas relief cannot raise a federal constitutional claim in federal court unless he first properly raised the issue in the state courts.") (citations omitted). A state prisoner "'must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process,' including review by the state's court of last resort, even if review in that court is discretionary." *Pruitt v. Jones*, 348 F.3d 1355, 1358-59

(11th Cir. 2003) (quoting *O'Sullivan*, 526 U.S. at 845).

To exhaust a claim, a petitioner must make the state court aware of both the legal and factual bases for his claim. *See Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) ("Exhaustion of state remedies requires that the state prisoner 'fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass on and correct alleged violations of its prisoners' federal rights.'") (quoting *Duncan v. Henry*, 513 U.S. 364, 365 (1995)). A federal habeas petitioner "shall not be deemed to have exhausted the remedies available in the courts of the State . . . if he has the right under the law of the State to raise, by any available procedure, the question presented." *Pruitt*, 348 F.3d at 1358. The prohibition against raising an unexhausted claim in federal court extends to both the broad legal theory of relief and the specific factual contention that supports relief. *Kelley v. Sec'y, Dep't of Corr.*, 377 F.3d 1317, 1344 (11th Cir. 2004). The requirement of exhausting state remedies as a prerequisite to federal review is satisfied if the petitioner "fairly presents" his claim in each appropriate state court and alerts that court to the federal nature of the claim. 28 U.S.C. § 2254(b)(1); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). To establish cause for a procedural default, a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in state court." *Wright v. Hopper*, 169 F. 3d 695, 703 (11th Cir. 1999).

See also Murray v. Carrier, 477 U.S. 478 (1986).  To show prejudice, a petitioner must demonstrate not only that the errors at his trial created the possibility of prejudice but that they worked to his actual and substantial disadvantage and infected the entire trial with error of constitutional dimensions. United States v. Frady, 456 U.S. 152, 170 (1982).  The petitioner must show at least a reasonable probability of a different outcome. Henderson, 353 F.3d at 892; Crawford v. Head, 311 F.3d 1288, 1327-28 (11th Cir. 2002).

Alternatively, a petitioner may obtain federal habeas review of a procedurally defaulted claim if review is necessary to correct a fundamental miscarriage of justice. Edwards v. Carpenter, 529 U.S. 446, 451 (2000); Carrier, 477 U.S. at 495-96.  A fundamental miscarriage of justice occurs in an extraordinary case where a constitutional violation has probably resulted in the conviction of someone who is actually innocent. Schlup v. Delo, 513 U.S. 298, 327 (1995); Henderson, 353 F.3d at 892.  This exception requires a petitioner's "actual" innocence. Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001).  To meet this standard, a petitioner must show a reasonable likelihood of acquittal absent the constitutional error. Schlup, 513 U.S. at 327.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Claims of ineffective assistance are analyzed under the test set forth in Strickland v. Washington, 466 U.S. 668 (1984).  A petitioner must show both deficient performance by counsel and resulting prejudice.  Demonstrating deficient performance "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687.  Deficient performance is established if, "in light of all the circumstances, the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." Id. at 690.  However,

"counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* Additionally, "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.*

White must demonstrate that counsel's alleged error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691-92. To show prejudice, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. A petitioner cannot meet his burden merely by showing that counsel's choices were unsuccessful:

> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial . . . . We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992).

Sustaining a claim of ineffective assistance of counsel on federal habeas review is difficult because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (citations omitted). *See also Pinholster*, 563 U.S. at 202 (a petitioner must overcome the "'doubly deferential' standard of *Strickland* and AEDPA."). If a claim of ineffective

assistance of counsel can be resolved through one of the *Strickland* test's two prongs, the other prong need not be considered. *Strickland*, 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one.")

## DISCUSSION

**Ground One**

White alleges that the State's failure to present sufficient evidence of second degree murder resulted in a federal due process violation. He argues that the State did not show that Andrea died due to "the criminal agency of another person," rather than as a result of natural or accidental causes. (Dkt. 1, p. 5.)

A review of the trial transcript shows that the State's evidence of White's guilt was circumstantial. And White stated in his brief that the evidence of a criminal act was circumstantial. (Dkt. 25, Ex. 2; Ex. 9, pp. 11-12.) Florida's standard of review for circumstantial evidence cases provides that "'[w]here the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence.'" *Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 460 (11th Cir. 2015) (quoting *Thorp v. State*, 777 So.2d 385, 389 (Fla. 2000)). This involves a higher standard of proof than the federal sufficiency of the evidence standard applied in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See id.* at 451 (Florida uses a "heightened burden of proof for cases involving circumstantial evidence.").

White raised only state law to support his argument when he brought it on direct appeal. (Dkt. 25, Ex. 9, pp. 11-14.) He did not cite *Jackson* or refer to any federal authority

or constitutional provision. (*Id.*)  His reliance on state law in this circumstantial evidence case, without any mention of federal law, was insufficient to exhaust a federal claim in state court.  *See id.* at 460-62.  State procedural rules do not provide for successive direct appeals.  *See* Fla. R. App. P. 9.140.  Therefore, White's unexhausted claim is procedurally defaulted.  *See Smith*, 256 F.3d at 1138.  White does not argue or demonstrate that an exception applies to overcome the default.  The claim presented in Ground One is procedurally barred from federal habeas review.

**Ground Two**

The State theorized that White smothered Andrea with a pillow. White alleges that trial counsel was ineffective for failing to investigate and file a motion to suppress the pillows found in the home.  He further claims that counsel should have moved to suppress Andrea's purse, which was also recovered from the Whites' home.  White alleges that Desiree Patton and Andrea's family members may have tampered with these items when they entered the house during his absence.

The state postconviction court denied White's ineffective assistance claim:

> Defendant alleges ineffective assistance of counsel for failing to investigate and file a proper motion to suppress.  Defendant alleges that the pillow that the State asserted was the murder weapon should have been suppressed because the victim's mother and friends lived at the house where the crime took place for three days before the police investigation began. Defendant asserts that if the pillows were washed, as the State alleged, they could have been washed within the three days that these people were staying at the house.  The State's argument being that the Defendant washed the pillows to conceal evidence of the crime.
> The Defendant also claims that the purse of the victim should have also been suppressed because this evidence also had the potential to be tampered with while the guests were staying at the house prior to the police investigation.  Defendant alleges he was prejudiced by this evidence being introduced because the State was allowed to draw inferences from them to persuade the jury that the Defendant was guilty.

With regard to the pillows, the record refutes the Defendant's claim. The pillows were never introduced into evidence, and therefore trial counsel cannot be deemed ineffective for failing to move to suppress them. Furthermore, defense counsel argued in closing argument that the State lacked sufficient evidence by referencing the fact that the pillows were never introduced at trial.

With regard to the victim's purse and its contents, the Defendant has not stated any valid basis to suppress this item.  All relevant evidence is admissible at trial except as otherwise provided by law. See § 90.402, Florida Statutes.  Relevant evidence is evidence tending to prove or disprove a material fact.  § 90.401, Florida Statutes.

Furthermore, the record refutes the Defendant's claim that the purse was "planted" after he vacated the premises.  There was ample testimony at trial, including the Defendant's own, that shows that the victim's purse was found at the house the day after the victim disappeared while the Defendant was still living there.  Lastly, Officer Norman Gay, arriving at the house in response to a report by the victim's mother that the victim was missing, testified that he spoke to the Defendant about the purse and that the Defendant told the officer that he had put the purse in the closet and that the victim's insulin was in the purse.  Therefore, the evidence indicates that the purse and the insulin inside the purse were found while the Defendant was still living in the house.

Lastly, defense counsel did argue that the purse identified by the victim's friend as the one she took out of the closet was not the actual purse pulled out of the closet, and that this was supported by the testimony of the Defendant and other witnesses.  The State notes in its response that discrepancies in evidence are decided by the jury – they are not a basis to suppress evidence.  See Hertz v. State, 803 So.2d 629, 647 (Fla. 2001); I.R. v. State, 385 So.2d 686 (Fla. 3d DCA 1980).  The Defendant has failed to sufficiently show ineffectiveness of counsel.  This claim is denied.

(Dkt. 25, Ex. 21) (court's record citations omitted).

The state court determined that no basis for suppression existed.  This Court must accept the state court's conclusion that, under Florida evidentiary law,[4] counsel had no grounds to seek suppression. See, e.g., Herring v. Sec'y, Dep't of Corr., 397 F.3d 1338, 1354-55 (11th Cir. 2005) ("The Florida Supreme Court already has told us how the issues

---

[4] White does not allege any federal constitutional basis upon which counsel could have moved to suppress these items.

would have been resolved under Florida state law had [petitioner's counsel] done what [petitioner] argues he should have done. . . . It is a 'fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters.'") (quoting *Agan v. Vaughn*, 119 F.3d 1538, 1549 (11th Cir. 1997)); *Callahan v. Campbell*, 427 F.3d 897, 932 (11th Cir. 2005) ("[T]he Alabama Court of Criminal Appeals has already answered the question of what would have happened had [petitioner's counsel] objected to the introduction of [petitioner's] statements based on [state law]–the objection would have been overruled. . . . Therefore, [petitioner's counsel] was not ineffective for failing to make that objection."). *See also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus.").

White has not shown that the state court's determination was contrary to or an unreasonable application of clearly established federal law, or was based on an unreasonable determination of the facts.  He is not entitled to relief on Ground Two.

**Ground Three**

White alleges that trial counsel was ineffective for failing to argue that his statements to detectives in New York, in transit from New York to Florida, and at the police station upon returning to Florida were obtained in violation of his constitutional rights.  Specifically, he asserts that law enforcement conducted custodial interrogations without providing him warnings under *Miranda v. Arizona*, 384 U.S. 436 (1966).  White claims that he was not free to leave because "from the time [he] met with the Florida detectives in New York he was under [police] supervision and control."  (Dkt. 1, p. 9.)

Under the Fifth Amendment, an individual has a "privilege . . . not to be compelled

to incriminate himself." *Id.* at 439.   Whether White was in custody when he spoke to police matters because "the right to *Miranda* warnings attaches when a custodial interrogation begins." *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006).[5]   Determining custody involves examining the circumstances surrounding the interrogation and whether, under those circumstances, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave. *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).   While a court determining whether an individual was in custody must examine all of the circumstances of the interrogation, "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322  (1994) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)) (internal quotation marks omitted).   *See also Miranda*, 384 U.S. at 444 ("By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.").   "The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996.)

The state court rejected White's claim of ineffective assistance of counsel, finding that White was not in custody when he spoke to officers:

> Defendant alleges ineffective assistance of counsel for failure to raise Miranda violations.   Defendant claims it was a violation of Miranda for Detectives from Florida to travel to New York to inform the Defendant that his wife had died and to ask him questions and search the house at which he

---

[5] *Miranda* provides that an individual subject to custodial interrogation must be informed "prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."  384 U.S. at 479.

was staying in New York.  This was not a violation of Miranda because there was no custodial interrogation involved and therefore no Miranda warnings were necessary.  See Ramirez v. State, 739 So.2d 568 (Fla. 1999).

Defendant also claims it was a violation Miranda for the Detectives to escort Defendant home on a flight from New York to Florida without reading him his warnings.  Defendant does not allege that any questioning went on during this flight and therefore no Miranda issues exist.  Id.  However, Defendant claims that upon landing, the Detectives drove the Defendant directly to the police station where he was placed in an interrogation room and was questioned for hours.  Defendant claims that because the interrogation was not recorded, the Detectives did not Mirandize him before they started the questioning and that counsel should have moved to suppress any statements made by Defendant in this interview.  Defendant alleges he was prejudiced because the State was able to admit conflicting statements made by Defendant in response to questions asked by the Detectives.

The Defendant's claim is refuted by the record.  The Defendant testified at trial that he voluntarily spoke with Detective Mazza in New York and that he voluntarily returned to Florida.  Most importantly, the Defendant testified that he initially consented to the interview at the police station and when he stopped the interview, the officers drove him home.  Specifically, the State points to Defendant's testimony that Detective Sessa asked him if he was willing to talk to which Defendant responded "What choice do I have at that point?  Just told me I can't go anywhere.  I said yes."  The State further notes in a footnote in its response, that while Defendant testified at that point that he could not leave, the rest of the Defendant's testimony contradicts that statement, specifically where the Defendant testified that the officers drove him home when he stopped the interview and refused to waive his rights.  Furthermore, aside from the Defendant's internally contradictory testimony, Detectives Sessa and Mazza testified in contradiction with the Defendant's assertion that he was told he was not allowed to leave.  Detective Mazza testified that the Defendant agreed to be interviewed before going home after the flight from New York because he "wanted to get it over with."  The Defendant testified that Detective Mazza told him to sign a release form but that upon his refusal, the detective stated, "well, then I'll take you home."  Consequently, there was no violation of Miranda in this situation.  The Defendant spoke to the officers voluntarily and was not in custody, therefore no Miranda warnings were necessary and there was no basis for which defense counsel could have moved to suppress the Defendant's statements.  This claim is denied.

(Dkt. 25, Ex. 21) (court's record citations omitted).[6]

White has not shown he was in custody when he talked to Detective Lisa Mazza in New York about Andrea's disappearance.   White agreed to talk with Mazza and was cooperative during their conversation.  (Dkt. 25, Ex. 2D, pp. 538, 542; Ex. 2H, p. 1198.) White was not under arrest.  They met at White's brother's house and talked outside by a bonfire.  (Dkt. 25, Ex. 2D, pp. 538, 474-75; Ex. 2H, p. 1198).  *See, e.g., Brown*, 441 F.3d at 1348 ("Although the location of the interview is surely not dispositive in determining whether the interviewee was in custody, [c]ourts are much less likely to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home.") (quoting *United States v. Ritchie*, 35 F.3d 1477, 1485 (10th Cir. 1994)) (internal quotation marks omitted)  (emphasis original). There is no indication that White sought to leave, asked police to leave, or decided he no longer wanted to speak to them.  At the end of the meeting, White agreed when Mazza asked him to return to Florida with her.  (Dkt. 25, Ex. 2D, p. 483-84; Ex. 2H, p. 1200.)  White has not shown any *Miranda* violation when he met with detectives at his brother's house in New York.

Nor does White show any *Miranda* violation during travel from New York to Florida. White voluntarily agreed to return to Florida with police.  (Dkt. 25, Ex. 2D, pp. 483-84; Ex. 2H, p. 1200.)  Police picked him up at his sister's house the day after he talked to Mazza. (Dkt. 25, Ex. 2D, p. 484; Ex. 2E, p. 567; Ex. 2H, p. 1201.)  Mazza testified that they had

---

[6] The state court's order provides that Petitioner argued a *Miranda* violation with respect to the detectives' searching the house in New York.  He makes no such claim in his federal habeas petition.  He says that police "asked Defendant for permission to search the house.  Defendant gave consent . . ."  (Dkt. 1, p. 9.)

"casual" conversation at the airport, and White testified that Mazza asked him about his relationship with Andrea in the days prior to her disappearance. (Dkt. 25, Ex. 2E, p. 569; Ex. 2H, p. 1202.) However, the record contains no indication that he changed his mind and wanted to stay in New York or that he became unwilling to talk to law enforcement. White was not under arrest, and there is no evidence that White's contact with officers during transit was involuntary at any time. The record therefore supports the state court's finding that *Miranda* was not required because White was not in custody.

Finally, the detectives' testimony supports the finding that White was not subject to custodial interrogation when White spoke to Sergeant James Sessa upon returning to Florida. Mazza testified that when she told him the interview would take place after they arrived in Florida, "He's like, good. He wanted to get it over with." (Dkt. 25, Ex. 2E, p. 573.) Sessa testified that White agreed to talk and was cooperative. (Dkt. 25, Ex. 2G, pp. 897, 898.)[7] Sessa further testified that White was informed he was not under arrest and was free to leave at any time. (*Id.*, p. 897.) Therefore, there is record support for the state court's conclusion that counsel did not perform deficiently for not seeking to suppress White's statements because he was not in custody.

However, White testified that he was not permitted to leave the interview room when he tried to do so. (Dkt. 25, Ex. 2H, p. 1204.)[8] Even assuming that counsel was deficient for not moving to suppress White's statements in light of his recollection of the interview,

---

[7] Mazza was not present when Sessa interviewed White. (Dkt. 25, Ex. 2E, p. 574.)

[8] None of White's statements to police were recorded. White alleges in support of his ineffective assistance claim that police had a duty to record his statements. But he cites no authority that the federal constitution requires recording of custodial or non-custodial interviews and does not establish that counsel was ineffective for not moving to suppress his statements on this basis.

he does not demonstrate resulting prejudice.  The crux of his comments to Sessa were introduced through other witnesses.[9]

White told Sessa about difficulties in the marriage.  Sessa testified that White reported problems with Andrea, whom he called a "bitch."  (Dkt. 25, Ex. 2G, p. 899.)  He also said Andrea was not happy with him and threatened to take the children.  (*Id.*)  Other witnesses testified to White's statements about marital trouble and potential child custody issues.  Gay testified that White told him that Andrea was considering divorce.  (Dkt. 25, Ex. 2C, p. 313.)  Susan Gula testified that White brought up his martial problems and stated that Andrea was going to leave him.  (*Id.*, pp. 401-03.)  Rhonda Draper testified that White told her he would never let Andrea have the children.  (Dkt. 25, Ex. 2D, p. 430.)  Marianne Salo testified that White told her Andrea was crazy and that they fought.  (Dkt. 25, Ex. 2E, p. 700-01.)  Rod Mick testified that White discussed marital difficulties, said Andrea was insane, and stated that he could not leave because he would lose the children.  (Dkt. 25, Ex. 2G, pp. 814-16, 822.)  Heather Hart said that White told her Andrea was leaving.  (*Id.*, p. 832.)  Finally, White himself testified to his marital problems.  (Dkt. 25, Ex. 2H, pp. 1140-42.) Therefore, the jury knew of White's statements about his marriage and children from sources other than Sessa.

White also gave Sessa a description of events immediately prior to Andrea's disappearance on the night of July 11.  Sessa testified that White told him that he and Andrea had sex and then had an argument.  (Dkt. 25, Ex. 2G, pp. 899-900.)  White told Sessa that Andrea slapped him, and also told Sessa that after the argument, Andrea

---

[9] White does not challenge the admissibility of other witnesses' testimony.

pointed a gun at him and pulled the trigger, but the gun misfired. (*Id.*, pp. 902, 908.)  He stated that he slapped the gun away and that Andrea then picked it up and walked out of the house.  (*Id.*, pp. 902-03.)  White told Sessa that Andrea left the house and got in a blue car.  (*Id.*, p. 903.)  Sessa testified that White said he did not know why he did not report Andrea missing.  (*Id.*)

White made similar statements about the events to many other witnesses.  Angelo Borringo, Gay, and Mazza all testified that White said he and Andrea had an argument.  (Dkt. 25, Ex. 2C, pp. 313-15; Ex. 2D, p. 476; Ex. 2E, p. 720.) White also told Patton, Gay, Mazza, Diane Cassett, Borringo, Fran Fitzgerald, Mick, Hart, and Andrea's son that Andrea hit him.  (Dkt. 25, Ex. 2C, pp. 254-55, 313-15; Ex. 2D, pp. 451, 476; Ex. 2E, pp. 720-21, 737; Ex. 2F, p. 762; Ex. 2G, pp. 817, 836-37.)  White stated to Judy Biolickey and Andrea's son that Andrea tried to shoot a gun at him but that it misfired.  (Dkt. 25, Ex. 2F, pp. 755, 762.)  White told numerous witnesses that Andrea left in a blue car.  (Dkt. 25, Ex. 2C, pp. 255-56, 318; Ex. 2D, p. 477; Ex. 2E, pp. 712, 721, 740; Ex. 2G, pp. 836-37.)  White also testified to these same matters.  (Dkt. 25, Ex. 2H, pp. 1159-64.)

Witnesses other than Sessa testified about White's failure to report Andrea missing.  White told Janis Friend that he could not file a missing person report for twenty-four hours.  (Dkt. 25, Ex. 2G, pp. 993-94.)  He likewise told Mazza during their conversation in New York that he attempted to report Andrea missing but was told by a dispatcher that he must wait twenty-four hours to do so.  (Dkt. 25, Ex. 2D, p. 481.)[10]  Patton testified that White told her his attorney said not to report Andrea missing.  (Dkt. 25, Ex. 2C, p. 250.)  Thus, while

---

[10] The State presented evidence that White made no such call, and that no twenty-four hour waiting policy existed.  (Dkt. 25, Ex. 2E, pp. 656-57.)

these witnesses did not say that White did not know why he failed to report Andrea missing, as White stated to Sessa, they informed the jury that White made inconsistent statements about any such report.

Therefore, the jury heard from sources besides Sessa about White's statements. White has not shown a reasonable probability that the outcome of trial would have been different had his specific statements to Sessa been excluded.  Accordingly, he does not show that he was prejudiced by counsel's failure to object to the use of his statement to Sessa.[11]

White does not demonstrate that the state court's decision was an unreasonable application of *Strickland* or was based on an unreasonable determination of the facts.[12]  He is not entitled to relief on Ground Three.

**Ground Four**

White argues that trial counsel was ineffective for failing to adequately cross-examine Dr. Daniel Schultz, the former assistant medical examiner who performed Andrea's autopsy, and Dr. Jon Thogmartin, the medical examiner who reviewed Schultz's findings.  Schultz testified that Andrea's death was due to homicidal violence of

---

[11] Sessa testified that, during the interview, White indicated he could not tell Sessa something because his mother-in-law would kill him.  (Dkt. 25, Ex. 2G, pp. 901-03.)  His specific remark in this context was not reported by other witnesses.  However, this statement is not necessarily inculpatory, and White testified that he meant he did not want to say that his mother-in-law had been sending prescription medications to Andrea, as he did not know at the time if "pills or what" had caused her death.  (Dkt. 25, Ex. 2H, p. 1206.)  White does not show that the exclusion of this statement through Sessa's testimony would have created a reasonable probability of a different outcome at trial.

[12] To the extent White alleges that trial counsel was ineffective for failing to preserve for appeal the issues raised in Ground Three, he is not entitled to relief.  He does not demonstrate any error, and, even if error occurred, he does not show that he would have been entitled to relief had the issue been preserved. *See United States v. Winfield*, 960 F.2d 970, 974 (11th Cir. 1992) (no ineffective assistance of counsel for failing to preserve or argue meritless issue).

undetermined etiology.   (Dkt. 25, Ex. 2G, p. 860.)   Thogmartin reached the same conclusion.  (*Id.*, p. 914.)

White states that Schultz was fired "for cause" from the medical examiner's office due to errors in an autopsy he performed subsequent to Andrea's autopsy.  (Dkt. 1, p. 11.) White asserts that counsel should have asked Schultz about his "incompetence" in the other case to "undermine his credibility, expertise, and professionalism."  (*Id.*)  He argues that counsel should have asked Thogmartin why Schultz was terminated and if, given his alleged error, he might have "missed something" in Andrea's case.  (*Id.*, pp. 11, 12.)

The state court rejected this claim of ineffective assistance:

I. Defendant claims that counsel was ineffective for failing to impeach Dr. Schultz with regard to him being fired as Assistant Medical Examiner for an error made in another case a few months after he did the autopsy on the victim.  The Defendant does not present a legally sufficient claim for relief. The ways in which one can attack a witness's credibility at trial are provided in § 90.608, Florida Statutes.  Attacking Dr. Schultz's credibility based on an alleged error committed in another case i[s] not a valid manner to attack a witness's credibility.  Furthermore, the Defendant fails to show how testimony regarding an autopsy in another, unrelated case would have be[en] relevant evidence as it is not shown how an alleged error in another unrelated case would tend to prove or disprove a material fact in the case at bar.  This claim is denied.

II. Defendant claims that counsel was ineffective for failing to impeach Dr. Schultz by asking Dr. Thogmartin, Dr. Schultz's supervisor, why Dr. Schultz was fired as Assistant Medical Examiner.  The Defendant again does not present a legally sufficient claim for relief for the reasons addressed above. Furthermore, the Defendant cannot demonstrate any prejudice as Dr. Thogmartin testified that Dr. Schultz's termination had nothing to do with the case at bar and that Dr. Thogmartin reviewed and signed off on all of Dr. Schultz's work, finding no discrepancies or problems in his report for this case.  Counsel was thus aware that Dr. Thogmartin thought Dr. Schultz's report was accurate and showing that there was no prejudice by counsel failing to inquire on the subject.  This claim is denied.

(Dkt. 25, Ex. 21.)

Thogmartin testified in a deposition that Schultz was not terminated because of his performance in Andrea's case.  (Dkt. 25, Ex. 21, Deposition of Dr. Jon Thogmartin, p. 4.)  Thogmartin did not elaborate on the reason for Schultz's termination.  Attached to White's amended postconviction motion was a letter from the medical examiner's office provided in response to White's records request.  It states that Schultz was dismissed due to "[i]nitial misinterpretation of the agent of injury in a case."  (Dkt. 25, Ex. 18, Letter from Medical Examiner, District Six, to David White.)

However, any allegation that Schultz's later error means he also erred in Andrea's autopsy is too speculative to warrant federal habeas relief.  *See Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (vague, conclusory, or unsupported allegations cannot support an ineffective assistance of counsel claim).  Additionally, this Court must afford deference to the state court's finding that, under Florida law, counsel could not have questioned Schultz about such an error in order to attack Schultz's credibility.  *See Herring*, 397 F.3d at 1354-55.  Finally, Thogmartin testified that he also concluded that Andrea died from homicidal violence.  (Dkt. 25, Ex. 2G, p. 914.)  Thus, even if White had cast doubt on Schultz's capabilities, the jury heard that Thogmartin reached the same conclusion about Andrea's death.  White does not allege any error in Thogmartin's review of the case.

White has not demonstrated that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claim.[13]  Ground Four warrants no relief.

**Ground Five**

White contends that trial counsel was ineffective for failing to make "timely and

---

[13] White's allegation that trial counsel was ineffective for failing to preserve the issue for appeal is without merit.  *See Winfield*, 960 F.2d at 974.

proper objections" several times during trial.

**A.**    White asserts that counsel should have objected when three State witnesses testified regarding lab results they did not prepare.  He claims that this violated *Crawford v. Washington*, 541 U.S. 36 (2004) because he was denied the opportunity to confront and cross-examine the reports' authors.[14]

In their testimonies, Schultz and Thogmartin addressed a toxicology report that revealed the presence of numerous substances in Andreas's body.  White attached to his amended postconviction motion a copy of what he claims is the report.  It was conducted in the Pinellas County Forensic Laboratory and was signed by Chief Forensic Toxicologist Robin Neuenschwander.  (Dkt. 25, Ex. 18, Report, Pinellas County Forensic Laboratory.)[15] Additionally, Florida Department of Law Enforcement crime lab analyst Darren Esposito testified about a DNA report based on tests performed at Bode Technology.[16]

The state court denied White's ineffective assistance claim:

> Defendant claims counsel was ineffective for failing to object to testimony by laboratory analyst Darren Esposito, Dr. Schultz and Dr. Thogmartin regarding the results of tests they did not perform.  Defendant alleges that he was prejudiced because he was unable to confront and cross examine the person who performed the tests.  The Defendant specifically alleges that these witnesses testified regarding test results from Bode Technology and that Drs. Schultz and Thogmartin relied on a toxicology report prepared by Robin Neuenschwander.  The Defendant claims that had counsel objected, the lab reports and the testimony with regard to such would have been excluded.

---

[14] *Crawford* held that the Confrontation Clause bars testimonial evidence by a non-testifying declarant unless the declarant is unavailable and the defendant has had a prior opportunity for cross-examination.  541 U.S. at 68.

[15] Thogmartin explained that the test was not performed by his laboratory.  (Dkt. 25, Ex. 2G, pp. 915-16.)

[16] Florida Department of Law Enforcement contracted with Bode Technology to perform testing due to the Department's overload of cases. (Dkt. 25, Ex. 2E, p. 560; Ex. 2G, p. 931.)

First, Darren Esposito testified as an expert witness in the area of DNA analysis.  Per § 90.704, Florida Statutes, expert witnesses may base their opinions on facts or data not in evidence if the facts or data are of a type reasonably relied upon by experts in the subject.  Furthermore, expert witnesses may rely on reports of others in reaching their own opinion.  See Schoenwetter v. State, 931 So.2d 857, 870-71 (Fla. 2006).  Therefore, Mr. Esposito testifying that Bode Laboratories handled the overflow work from the State and that after reviewing the reports from Bode that he was comfortable telling the jury that the victim's DNA matched the DNA found on the fingernail clipping taken from the victim's left hand was proper.

Next with regard to Drs. Schultz and Thogmartin relying on the toxicology report of Robin Neuenschwander, this was also proper.  As stated above, expert witnesses may rely on the reports of others.  See Schoenwetter, 931 So.2d at 871 (holding that medical examiners can rely on outside reports).  This claim is denied.

(Dkt. 25, Ex. 21) (court's record citations omitted).

An expert witness[17] may testify to an opinion based on facts that the expert assumes.  An expert is permitted in appropriate cases "to explain the facts on which his or her opinion is based without testifying to the truth of those facts."  *Williams v. Illinois*, 132 S.Ct. 2221, 2228 (2012).  *Williams* explains:

[T]his form of expert testimony does not violate the Confrontation Clause because that provision has no application to out-of-court statements that are not offered to prove the truth of the matter asserted. . . . Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause.

*Id.*

Schultz and Thogmartin utilized the toxicology report to make determinations about Andrea's death.  Specifically, the report showed that Andrea's body contained some alcohol, Benadryl, an antidepressant, and a muscle relaxant.  (Dkt. 25, Ex. 2G, pp. 857, 885-86, 914-16.)  However, Schultz concluded that these results did not explain Andrea's

---

[17] White does not object to the expert qualifications of any of these three witnesses.

death, stating that "I don't have a toxicological reason to blame the death on." (*Id.*, p. 859.) Thogmartin likewise did not believe that these substances accounted for Andrea's death. (*Id.*, pp. 916-17.)  Thus, Schultz and Thogmartin did not testify that the results of the toxicology test were in fact accurate; they merely used the results in reaching conclusions about Andrea's death.  White fails to show a *Crawford* violation to which counsel could have objected during the doctors' testimony.  In addition,  White does not explain how he was prejudiced by counsel's performance.  He does not establish any reasonable probability that the outcome of trial would have been different had Schultz and Thogmartin been prevented from testifying about the toxicology report.

Darren Esposito testified about results of a DNA test performed by Bode Technology.  Without testifying to the results' accuracy, he testified that the report showed no foreign DNA was found on fingernail clippings from Andrea's left hand, and no detectable DNA profile was obtained from the fingernail clippings of her right hand.  (Dkt. 25, Ex. 2G, pp. 932-33, 937.)  White has not shown that counsel was deficient for not objecting to Esposito's testimony.

Moreover, even if Esposito's testimony was excluded based upon an objection by counsel, White does not establish a reasonable probability that the outcome of trial would have been different.  The defense called Ashley Fullmer, a Bode Technology employee, who testified that the results from a partial female profile and partial reference sample taken from Andrea agreed with one another.  (*Id.*, p. 965.)  Fullmer also stated that White could be excluded as contributing to the partial female profile obtained from Andrea's left hand fingernail clippings.  (*Id.*, p. 964.)  Thus, Fullmer provided testimony consistent with Esposito's about the lack of foreign DNA found on Andrea.

White has not established deficient performance of counsel or resulting prejudice in connection with these three witnesses' testimonies.  He does not show that the state court's decision was contrary to or an unreasonable application of clearly established federal law, or was based on an unreasonable determination of the facts.

**B.**     White argues that counsel should have objected to improper prosecutorial comments.  An allegedly improper remark must be considered in the context of the proceeding as a whole, and relief is only available if an improper remark prejudiced the defendant's substantial rights. *See United States v. Beasley*, 72 F.3d 1518, 1525 (11th Cir. 1996) ("Prosecutorial misconduct is a basis for reversal only if, in the context of the entire trial and in light of any curative instruction, the misconduct may have prejudiced the substantial rights of the accused.").  *See also United States v. Young*, 470 U.S. 1, 11 (1985) ("[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial.").

**1.**     During opening statements, the prosecutor addressed White's refusal to provide a written statement when Deputy Gay initially responded on July 12 to perform a welfare check on Andrea.  White claims that the prosecutor's statement "violated [his] right to remain silent at the time he was interviewed by Deputy Gay, and the right not to testify at trial."  (Dkt. 1, p. 13.) Specifically, in White's postconviction motion, he cited a portion of the opening statement in which the prosecutor addressed his statements to Deputy Gay on July 12, and then said:

What's interesting and noteworthy and pay attention to this, the deputy then asks the defendant, will you sign a written statement?  And the defendant's response was, no, I will not.

You're going to hear that Desiree Patton filled out a statement and signed it, but this defendant refused to do that with Deputy Gay.

(Dkt. 25, Ex. 2B, pp. 182-83; Ex. 18, pp. 9-13.)

The state court denied this portion of White's claim:

I. Defendant claims counsel was ineffective for failing to object to the State introducing into its opening argument statements Defendant made to Deputy Gay.  Defendant claims the introduction of these statements violated the Defendant's right to remain silent at the time he was interviewed by Deputy Gay and his right not to testify at trial.  The Court finds that this claim has no merit.  Deputy Gay went to Defendant's house after the victim's friend became concerned because the victim had been missing for over 16 hours.  No body had been found at this time and Defendant was not a suspect because there was no criminal investigation being conducted.  The interview conducted by Deputy Gay was non-custodial and related only to a missing person.  If Defendant had wanted to invoke his right to remain silent, he could have by not making any statements to law enforcement at the time of the interview.

(Dkt. 25, Ex. 19.)

It is improper for a prosecutor to comment on a defendant's silence or decision not to testify in his defense.  *See Griffin v. California*, 380 U.S. 609, 615 (1965) ("[T]he Fifth Amendment . . . in its bearing on the States by reason of the Fourteenth Amendment, forbids . . . comment by the prosecution on the accused's silence.").   However, "[t]he government may comment on a defendant's silence if it occurred prior to the time that he is arrested and given his *Miranda* warnings."  *United States v. Rivera*, 944 F.2d 1563, 1568 (11th Cir. 1991).

White was not under arrest when Gay initially responded on July 12, when White spoke to him but refused to make a written statement.  Under these circumstances, White

does not show that the prosecutor improperly commented on his right to remain silent "at the time he was interviewed by Deputy Gay."   Nor does White establish that the prosecutor's remarks amounted to an improper comment on his right not to testify at trial. Accordingly, White fails to establish that counsel was ineffective for failing to object to the prosecutor's statement.   White has not demonstrated that the state court's decision was an unreasonable application of or contrary to Supreme Court precedent, or was based on an unreasonable determination of the facts.

      **2.**     White claims that counsel should have objected to remarks during the prosecution's opening statement that could only be refuted by White's testimony, thus requiring White to testify in his own defense.   His postconviction motion referred to lengthy portions of the opening statement in which the prosecutor addressed the anticipated testimonies of Patton, Fitzgerald, Mick, Hart, Schultz, and Thogmartin.   (Dkt. 25, Ex. 18, pp. 9-13.)   The state court rejected this portion of White's claim:

> Defendant also claims counsel was ineffective for failing to object to statements the State made in its opening argument that "required that defendant take the stand to refute them since only he could actually do so." A defendant is not required to take the stand in his own defense.   He has a constitutional right allowing him to testify at trial, but he may also waive this right.   See Cutter v. State, 460 So.2d 538 (Fla. 2d DCA 1984).   However, the prosecutor making proper statements in his opening argument about evidence that will be presented to the jury, evidence that the Defendant claims he is the only person qualified to refute, is not a violation of his right not to testify.   This claim is denied.

(Dkt. 25, Ex. 19.)

     White does not demonstrate any impropriety to which counsel could have objected. The prosecutor's statements informed the jury about evidence the State expected to present during the case.   "An opening statement gives counsel the opportunity to state

what evidence will be presented in order to make it easier for the jurors to understand what is to follow, and is not an occasion for argument." *United States v. Lizon-Barias*, 252 Fed. App'x 976, 978 (11th Cir. 2007). "Opening remarks are not evidence, and the purpose of opening argument is to outline what an attorney expects to be established by the evidence." *Occhicone v. State*, 570 So.2d 902, 904 (Fla. 1990)

Additionally, although White claims that the statements could only be refuted by his testimony, he does not demonstrate that his decision to testify was involuntarily made as a result. At a colloquy during trial, White told the court that his choice to testify was voluntary. He did not allege he was compelled to testify against his wishes to respond to the prosecution's opening statement. (Dkt. 25, Ex. 2G, pp. 981-82.) White has not established that the state court's decision was contrary to or an unreasonable application of clearly established federal law or based on an unreasonable determination of the facts.

**C.**    White asserts that counsel should have objected to the prosecutor's bolstering the credibility of Deputies Gay and Mazza[18] during closing arguments. In his amended postconviction motion, White appears to refer to the following prosecutorial statements about Gay:

> What else do we know? We know that Deputy Gay responds. If anybody has no motivation to color the testimony, distort the truth, it's Deputy Gay, isn't it? What does he got to gain out of this?

(Dkt. 25, Ex. 2I, p. 1333.)

> Here we go. We've got someone else who is in this conspiracy. It's Desiree. And now it's Norman Gay. They're involved in this conspiracy to

---

[18] Though White does not refer to Mazza by name, his claim is liberally interpreted as raising the same claim of ineffective assistance of counsel that he presented in his postconviction motion. The state court construed this claim as involving both Gay and Mazza.

misrepresent and distort the truth so we would implicate this man right here. See, that's what's happening here.

(*Id.*, p. 1337.)

White also referred to the prosecutor's remark about Mazza:

Now, what else do we know?  We know he goes to New York.  And the case is assigned to a detective named Lisa Mazza.  And counsel says, well, she's got an interest in this case.  What's the interest?  We don't know because we don't know by way of evidence.  There's been no evidence that [Mazza] gets a bonus, that she gets some kind of notoriety if he's convicted."

(*Id.*, p. 1346.)

The state court rejected White's claim that counsel was ineffective for failing to

object to these statements:

Defendant claims counsel was ineffective for failing to object to the State improperly bolstering Deputy Norman Gay's testimony in its closing argument.  The Defendant specifically refers to the prosecutor's statement that Deputy Gay has no motivation to "distort the truth" and, though the Defendant never expressly mentions the State's attempt to bolster Detective Mazza's testimony, the Defendant quotes a statement made by the prosecution referring to Detective Mazza.

The State argues and the Court agrees that the statements at issue did not vouch for the credibility of either officer's testimony.  The State claims that read in context, the statements were fair comments on the evidence and proper replies to defense counsel's closing arguments.  With regard to the prosecutor's comments about Deputy Gay, the comments at issue are spread out over five pages of trial transcripts.  The prosecutor's arguments are not statements bolstering Deputy Gay's credibility, but rather comments on the Defendant's testimony and responses to defense counsel's arguments.  Specifically, the Defendant testified that Deputy [G]ay told the Defendant not to write a statement, and Deputy Gay testified that the Defendant actually refused to write a statement.  Defense counsel then argued that Deputy Gay's testimony about his conversation with the Defendant was inaccurate because everyone was under stress.  Defense counsel further argued that the jurors cannot know what was actually said because the conversation was not recorded.  Therefore, it is clear to the Court that the State was simply arguing in response to the defense's argument when it stated that Deputy Gay had no reason to distort what occurred between himself and the Defendant.  The State was responding to the defense's assertion that Deputy Gay's testimony was inaccurate and

could not be verified.  This argument was proper under the case law cited by the State.  See Williamson v. State, 994 So.2d 1000, 1013 (Fla. 2008).

With regard to the comments about Detective Mazza quoted by the Defendant in his motion, the State argues and the Court agrees that these comments are not bolstering either.  The State asserts that the prosecutor was responding to defense counsel's argument that everyone involved in the case had an interest in the outcome.  The State, in response to this, argued that Detective Mazza did not have an interest in the case as far as receiving a bonus or notoriety and that her only interest was that it was her job to find the victim's murderer.  The Court finds that when read in context, the State's comments were not improper bolstering.  This claim is denied.

(Dkt. 25, Ex. 21.)

A prosecutor may not bolster testimony of a state witness:

Ordinarily, it is improper for a prosecutor to bolster a witness's testimony by vouching for that witness's credibility. United States v. Hands, 184 F.3d 1322, 1334 (11th Cir.1999). Bolstering occurs when " 'the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness' credibility.' " United States v. Knowles, 66 F.3d 1146, 1161 (11th Cir.1995) (quoting United States v. Sims, 719 F.2d 375, 377 (11th Cir.1983)).  A prosecutor's comments can fail this test in two ways: (1) by placing the prestige of the government behind the witness, or (2) by indicating that information not before the jury supports the witness's credibility. Id. The rule against bolstering does not, however, prevent the prosecutor from commenting on a witness's credibility, which can be central to the government's case. United States v. Hernandez, 921 F.2d 1569, 1573 (11th Cir.1991).

United States v. Bernal-Benitez, 594 F.3d 1303, 1313–14 (11th Cir. 2010).

White does not show that the prosecutor improperly bolstered the testimony of Mazza or Gay.  The prosecutor did not support these witnesses' testimonies with the prestige of the government or suggest that information not known to the jury substantiated their credibility.  Furthermore, as stated in Bernal-Benitez, attorneys are permitted to argue about witness credibility.  Id. at 1314.  The prosecutor had reason to address Mazza's

credibility, as the defense questioned whether she became too involved in the case.[19]

Additionally, the prosecutorial comments that White identifies may be considered fair reply to defense counsel's closing argument..  "[A] prosecutor, as an advocate, is entitled to make a fair response to the arguments of defense counsel." *United States v. Stanley*, 495 Fed. App'x 954, 957 (11th Cir. 2012) (citing *United States v. Sarmiento*, 744 F.2d 755, 765 (11th Cir. 1984)).  *See also Rivera v. State*, 840 So.2d 284, 288 (Fla. 5th DCA 2003) ("Based on notions of fundamental fairness, the doctrine of invited response allows the state to comment on the issues raised by the defendant.").[20]  Defense counsel stated in closing argument, "You can ask yourself whether the testimony agrees with anybody else in the case and, importantly, who has an interest in the outcome of this case.  Most

---

[19] Defense counsel asked Mazza on cross-examination:

Q. [ ] You didn't go to Desoto and actually talk with the people that had personal knowledge of this information [concerning a lead], correct?

A.  No.

Q. Ma'am, do you feel you have a vested interest in this case?

A. It's assigned to me.

Q. But do you think what happens with regard to this case may reflect negatively on you as far as performance?

A. No.

Q. And would you agree with me that in this case at some point it became - - the investigation on this case became too personal for you where you lost objectivity?

A. No.

(Dkt. 25, Ex. 2E, p. 621.)

[20] White makes a vague allegation that the State "[a]lso . . . was allowed to make inappropriate arguments during closing arguments that were designed to mislead and confuse the jury."  (Dkt. 1, p. 13.) White has not identified any particular statements in support of this assertion.  To the extent White may be referring to statements other than those addressed, he fails to show entitlement to relief.

everybody involved has an interest in it one way or another, either professional interest or mostly personal interest." (Dkt. 25, Ex. 2I, pp. 1300-01.) He also suggested that Patton was responsible for Andrea's death.[21] He stated that Gay and Patton were "accusing [White] of all these things" during the July 12 welfare check and noted that nobody recorded White's "varying testimony" and that everyone was "under some form of stress." (Dkt. 25, Ex. 2I, pp, 1312, 1313.) White shows no basis for counsel to have objected. Nor does he show a reasonable probability that the outcome would have been different had counsel done so.

White does not show that the state court unreasonably applied *Strickland* or unreasonably determined the facts in making its decision. He is not entitled to relief on Ground Five.

**Ground Six**

White asserts that trial counsel was ineffective for failing to call witnesses.

**A.**   Andrea took insulin to manage her diabetes. White alleges that counsel should have called an expert witness to testify about the "adverse effects of drugs, alcohol, and insulin," as well as the "detrimental effects" if diabetes is not "monitored and controlled properly." (Dkt. 1, p. 15.) He suggests that the interaction of alcohol, drugs, and insulin might have caused Andrea's death. The state court denied White's claim:

> 1. Defendant claims that counsel was ineffective for failing to call an expert witness to testify to the detrimental health effects of diabetes (a condition the

---

[21]There was testimony that Andrea's blood sugar was abnormal on July 11 such that Patton, a "CNA home health aid[e]," was surprised Andrea was not in a coma. (Dkt. 25, Ex. 2C, pp. 223, 283-84.) Defense counsel theorized that Andrea went to Patton's house after the argument on July 11 and died of an insulin overdose when Patton gave her too much insulin. (Dkt. 25, Ex. 2I, pp. 1321-23.) He theorized that Patton, who was also familiar with the Cheltnam Court location, moved Andrea's body there because she would lose her license if it became known that she gave Andrea an injection. (*Id.*, pp. 1320, 1323.)

victim had).  Defendant states that he told trial counsel that the victim was a diagnosed insulin dependent diabetic but that counsel adamantly refused to call an expert.  Defendant states that counsel should have called the expert to testify to the detrimental effects of drugs and alcohol mixed with insulin.  Defendant alleges he was prejudiced because without this expert testimony, the jury went into deliberations believing that the victim's condition along with drug and alcohol consumption could not have caused her death.

This claim is refuted in part by the record.  As noted by the State, the toxicology report indicated low levels of both drugs and alcohol in the victim's tissues.  However, both medical examiners testified at trial that the alcohol level was consistent with the alcohol generated during decomposition.  This partially refutes the Defendant's claim of ineffective assistance of counsel with regard to the victim's alcohol consumption.

Furthermore, the Defendant has failed to sufficiently allege prejudice where Dr. Schultz testified upon cross-examination that insulin shock or diabetic shock can be fatal and that the substances found in the victim's system could cause sedation and drowsiness.  Dr. Schultz further testified that if a person with reported high levels of blood sugar to the point that it is surprising that she is not in a coma, leaves her home, comes back and injects herself or is injected with a large amount of insulin and is then carried to another location and left, it would not be inconsistent with the medical examiner's findings, thus apprising the jury of the fact that nothing in the medical examiner's report was inconsistent with a diabetes-related death.

Finally, as the State argues, even if an expert witness could have testified as the Defendant suggests, that testimony would do nothing to change the fact that Dr. Schultz testified that he believed the death to be a homicide based on the fact that the body was found in a remote location. Dr. Thogmartin also testified that the fact that the victim was not found at her home was significant because typically deaths from natural causes remain where they are[ ] and are not found at a remote location.  Dr. Thogmartin further testified that even if the victim's death was accidental by nature of an insulin overdose, that somebody would have had to transport her body to the pond where it was found.  Testimony by an expert as the Defendant suggests would not have changed the circumstances of where the victim's body was discovered.  Therefore the Defendant does not sufficiently allege prejudice.  This claim is denied.

(Dkt. 25, Ex. 19.)

White does not identify any expert who could have testified at trial.  Nor does he

provide any factual basis upon which an expert could have testified as he hypothesizes.

White simply theorizes about what an expert witness might have said.  Under these

circumstances, he cannot show that counsel was ineffective for not calling an expert witness to testify to the interaction of insulin with the drugs and alcohol found in Andrea's body.  *See United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) ("[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on affidavit.  A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim.") (footnotes omitted); *Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001) ("Johnson offers only speculation that the missing witnesses would have been helpful.  This kind of speculation is 'insufficient to carry the burden of a habeas corpus petitioner.'") (quoting *Aldrich v. Wainwright*, 777 F.2d 630, 636 (11th Cir.1985)).  Finally, "[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one [a reviewing court] will seldom, if ever, second guess."  *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995).  White does not demonstrate that the state court unreasonably applied *Strickland* or unreasonably determined the facts in rejecting his claim.[22]

**B.**     White also argues that counsel should have called his divorce attorney, Art Hadley, to testify about the circumstances of White's trip to New York.  The state court denied this claim:

> II. Defendant claims that counsel was ineffective for failing to call Defendant's divorce attorney, Art Hadley, as a defense witness.  Defendant claims that Mr. Hadley would have supported Defendant's version of events and also

---

[22] White also alleges that trial counsel was ineffective for not preserving the issue for appeal.  He does not establish that the lack of a defense expert is an issue reviewable on appeal.  His claim is without merit.  *See Winfield*, 960 F.2d at 974.

would have refuted the flight allegations made by the State. Defendant alleges that Mr. Hadley was available to testify and that he was on the witness list to testify at trial, but was never called.

Specifically, the Defendant alleges that Mr. Hadley would have testified that he advised the Defendant not to report his wife missing and would have testified to the "chronology of events surrounding defendant's trip to New York after the disappearance of his wife, including the events surrounding the 'Amber' alert that was filed by Florida officials, thereby refuting the State's allegations of a cover up to hinder being prosecuted, flight and eluding Florida law enforcement officials."

This claim is refuted by the record. During a telephone deposition of Mr. Hadley on January 28, 2008, Mr. Hadley testified that when the Defendant contacted him on July 12, 2006, he told the Defendant as follows:

> I told him to take a time out, not to do anything to make things worse, not to harass her (Defendants's wife), and wait until she returns home and try to work things out, and if they still could not resolve their differences, then I would do their divorce.

Mr. Hadley was also specifically asked whether he had advised the Defendant not to report his wife missing, to which he replied "I can't answer that yes or no, because I can't tell you specifically what happened in that conversation. I can tell you in general I told him don't harass her, take a time out and when she comes back try and resolve it." Mr. Hadley further stated that he could not "recall the specifics of the conversation (with the Defendant. I only recall what was generally said, what was the tenure [sic], what was the purpose of that message I was trying to convey." Therefore the Defendant's claim that Mr. Hadley would have testified that he told the Defendant not to report his wife missing is directly refuted by the record where it is clear that Mr. Hadley does not recall what he told Defendant.

With regard to the Defendant's claim that Mr. Hadley could have testified to the "chronology of events surrounding defendant's trip to New York," the State indicates in its response and the Court agrees that the Defendant has failed to show how this is relevant to the Defendant's motivation for leaving Florida two days after his wife is reported missing. The record indicates through the Defendant's testimony that the decision to travel to New York with his children was his own and that Mr. Hadley was not contacted until after the Defendant arrived in New York and was informed by his sister of the "Amber" alert and his wife's body being found. Therefore, because Mr. Hadley was not contacted until after the Defendant arrived in New York, he could not have testified to the chronology of events surrounding the Defendant's trip.

Furthermore, the State points out that the Defendant does not allege that Mr. Hadley would have testified as to the Defendant's *reason* for going to New York, refuting the Defendant's allegation that Mr. Hadley had relevant

evidence regarding the Defendant's alleged fleeing of Florida law enforcement. Lastly, the record refutes the Defendant's claim that the New York police officers testified that the Defendant was "hiding at his sister's house," as neither New York officer testified to this. Nor did Detective Mazza indicate such. This claim is denied.

(Dkt. 25, Ex. 21) (court's record citations omitted).

Hadley's deposition shows that, in response to White stating that Andrea had left him, he advised White to take some time, not to harass her, and to try to reconcile. (Dkt. 25, Ex. 21, Telephone Deposition of Arthur Hadley.) Hadley could not recall specifics of the conversation, including whether he told White not to report Andrea missing. (*Id.*) There is no indication that Hadley's purported testimony would have countered allegations by the State that White fled Florida after Andrea went missing. White fails to show a reasonable probability that the outcome of trial would have been different had Hadley testified. White has not shown that the State court unreasonably applied *Strickland* or unreasonably determined the facts in rejecting this claim. Ground Six warrants no relief.

**Ground Seven**

White argues that trial counsel was ineffective for failing to request complete and proper jury instructions because the instruction for the lesser included crime of manslaughter by act was erroneous. The state court denied White's claim:

Defendant claims that counsel was ineffective for failing to request complete and proper jury instructions. Defendant alleges that the manslaughter instruction given was erroneous because it contained an "intent" element and that there was already a certified conflict between Florida Courts on this subject. The Defendant alleges he was prejudiced because the jury was given a defective instruction and that influenced the verdict.

The Defendant's claim is without merit. The jury instruction used had not been invalidated by the Florida Supreme Court. See Rodriguez v. State, 919 So.2d 1252, 1272 (Fla. 2005) (*citing* Thompson v. State, 759 So.2d 650, 665 (Fla. 2000)). The Florida Supreme Court did not amend the standard jury instruction for manslaughter until December of 2008. See In re Standard

Jury Instruction in Criminal Cases – Report 2007-10, 997 So.2d 403 (Fla. 2008).  The Defendant's trial was in April of 2008.  Therefore, counsel was not ineffective for failing to object.

Furthermore, in Singh v. State, 36 So.3d 848 (Fla. 4th DCA 2010), the court held that the instruction given was not fundamentally erroneous where the instruction gave the jury the opportunity to convict the defendant of manslaughter by culpable negligence.  In the case at bar, the instruction given was as follows:

> Manslaughter.  Before you can find the defendant guilty of manslaughter as a lesser crime, the State must prove the following two elements beyond a reasonable doubt: Number one, Andrea White is dead.  Number two, David White, A, intentionally caused the death of Andrea White or, B, the death of Andrea White was caused by the culpable negligence of David White.

The Court in Singh held that the instruction given "allowed the jury two options in finding the second element of manslaughter by act: either the appellant 'intentionally cause[d] the death' or the death 'was caused by culpable negligence' of the appellant."  The Court found no fundamental error exists when the option is given.  As the State notes, other districts, including the Second District Court of Appeals have ruled similarly.  See e.g., Barros-Dias v. State, 41 So.3d 370 (Fla. 2d DCA 2010).  This claim is denied.

(Dkt. 25, Ex. 21) (court's record citations omitted).

In *State v. Montgomery*, 39 So.3d 252, 255-57 (Fla. 2010) the Florida Supreme Court held that the standard jury instruction on manslaughter by act misstated Florida law by adding an element of intent to kill.  Providing the instruction as a lesser offense constituted fundamental, per se reversible error, in Montgomery's case because Montgomery was convicted of second degree murder, an offense only one step removed from manslaughter.  *Id.* at 259.

The jury instruction for manslaughter by act used at White's April 2008 trial was consistent with the standard instruction then in effect.  *See* Fla. Std. Jury Inst. (Crim.) 7.7 (2006); *In re Standard Jury Instructions in Criminal Cases–Instruction in Manslaughter*

*Cases*, 997 So.2d 403 (Fla. 2008).  The Florida Supreme Court's *Montgomery* decision had not issued at the time of White's trial.[23]  White does not cite any authority, controlling at the time of trial, that held the jury instruction as given in his case was erroneous.[24]  The state court determined that counsel could not be deemed ineffective for failing to object to the standard instruction as it existed at the time of trial.  *See Thompson v. State*, 759 So.2d 650, 665 (Fla. 2000) ("[The Florida Supreme Court has] previously stated that trial counsel's failure to object to standard jury instructions that have not been invalidated by [the Florida Supreme Court] does not render counsel's performance deficient.").  Counsel's performance must be reviewed based on the circumstances at the time of the act or omission.  *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").  Furthermore, as this claim involves the state court's interpretation of Florida law, deference must be afforded to the state court's decision.  *See Herring*, 397 F.3d at 1354-55.

White also alleges that trial counsel's failure to object meant that the question of the instructions' propriety was not preserved for appeal, and therefore, any appellate claim

---

[23] Nor had Florida's First District Court of Appeal found the standard manslaughter by act instruction erroneous in *Montgomery v. State*, 70 So.3d 603 (Fla. 1st DCA 2009), which the Florida Supreme Court later approved.

[24] In his reply, White states that the appellant in *Daniels v. State*, 121 So.3d 409 (Fla. 2013) obtained relief pursuant to *Montgomery* "even though Daniels' trial was on September 15, 2009, before the decision in *Montgomery*."  (Dkt. 32, p. 10.)  He therefore argues that he "also qualifies for the same relief . . ."  (*Id.*)  However, the holding in *Montgomery* applied to *Daniels* because *Daniels* was decided on direct appeal.  *See, e.g., Falcon v. State*, 162 So.3d 954, 960 (Fla. 2015) (a Florida Supreme Court decision favorable to defendants applies to all convictions that have not yet become final through the issuance of an appellate court mandate).  White did not challenge the jury instructions on direct appeal.  (Dkt. 25, Ex. 9.)  His only argument was a collateral challenge alleging ineffective assistance of trial counsel.

could only be raised under "the higher standard of proving a fundamental error."  (Dkt.1, p. 17.)  However, White does not show any error that counsel failed to preserve.  Trial counsel performed in accordance with Florida law as it applied at the time of trial, and White does not demonstrate that counsel could have anticipated a change in the law. *See United States v. Ardley*, 273 F.3d 991, 993 (11th Cir. 2001) (rejecting the argument "that an attorney's failure to anticipate a change in the law constitutes ineffective assistance of counsel.").  Accordingly, White does not demonstrate that trial counsel provided ineffective assistance for failing to preserve an objection to the manslaughter by act instruction. *See Winfield*, 960 F.2d at 974.

White has not shown that the state court unreasonably applied *Strickland* or unreasonably determined the facts when it denied his claim.  He is not entitled to relief on Ground Seven.

**Ground Eight**

White alleges that the trial court erred in providing an erroneous jury instruction on manslaughter by act, thus violating his federal due process rights.  White did not exhaust the federal nature of this claim when he brought it in his amended postconviction motion.  (Dkt. 25, Ex. 18, pp. 27-34.)  Accordingly, the claim is unexhausted.  As the state court noted in rejecting his state law trial court error claim, an allegation of trial court error is properly brought on appeal, not in a postconviction motion.  (Dkt. 25, Ex. 19.)  *See Bruno v. State*, 807 So.2d 55, 63 (Fla. 2001) ("A claim of trial court error generally can be raised on direct appeal but not in a rule 3.850 motion. . .") (footnote omitted).   However, White cannot return to state court to raise a federal claim in a successive, untimely direct appeal.  Therefore, the claim is procedurally defaulted.  White does not establish that an exception

applies to overcome the default.  Accordingly, Ground Eight is barred from federal habeas review.

**Ground Nine**

The state trial court sentenced White to forty-six years in prison, with ten years suspended.  (Dkt. 25, Ex. 7.) White contends that the trial court violated his federal due process rights by imposing a "departure sentence" based upon facts that were not submitted to a jury and proven beyond a reasonable doubt.  (Dkt. 1, p. 21.)

*Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Blakely v. Washington*, 542 U.S. 296, 303 (2004) clarified that "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant."

The state court rejected White's claim when he raised it in his Rule 3.800(a) motion to correct illegal sentence:

> In order for a sentence to be held illegal under rule 3.800(a), it must impose a sentence under which "the terms or conditions of the punishment for a particular offense are impermissible as a matter of law."  Carter v. State, 786 So.2d 1173, 1181 (Fla. 2001) (quoting Young v. State, 716 So.2d 280, 282 (Fla. 2d DCA 1998)).
>     The Defendant's sole claim for relief is that his sentence of 46 years is illegal.  The Defendant argues that 46 years is an illegal sentence because it "exceeds the statutory maximum established by the sentencing guideline scoresheet."
>     The Defendant's argument is without merit.  A life sentence for a second degree murder conviction is a lawful sentence under Florida law. § 782.04(2), Florida Statutes;  Romero v. State, 105 So.3d 550 (Fla. 1st DCA 2012); Broom v. Tucker, 94 So.3d 502 (Fla. 2012); Berube v. State, 84 So.3d 436 (Fla. 2d DCA 2012).  The Defendant's 46 year sentence falls short of the maximum permissible penalty for his crime and was a legal sentence.

(Dkt. 25, Ex. 33.)

In its *per curiam* affirmance of this order, the state appellate court cited cases explaining that under sentencing law applicable to White's case, the sentencing court may impose a sentence up to the statutory maximum. *See Williams v. State*, 907 So.2d 1224, 1225 (Fla. 5th DCA 2005) ("Williams' reliance on *Blakely* is misplaced because under the Criminal Punishment Code, the sentencing judge is entitled to impose a sentence up to the statutory maximum without having to make any factual findings."); *Carpenter v. State*, 884 So.2d 385, 386 (Fla. 2d DCA 2004) ("Under the Criminal Punishment Code the sentencing judge has unfettered discretion to impose the statutory maximum for offenses committed on or after October 1, 1998.").

The Criminal Punishment Code scoresheet prepared in White's case lists a "lowest permissible prison sentence" of 246 months.  (Dkt. 7, p. 29.)  It does not state the maximum sentence with specificity, but notes that "[t]he maximum sentence is up to the statutory maximum for the primary and any additional offenses as provided in s. 775.082, F.S."  (Dkt. 7, p. 29.)   Section 775.082(3)(b)1., Fla. Stat., provides that a first degree felony is punishable by life imprisonment if "specifically provided by statute."  Section 782.04(2), Fla. Stat., in turn, specifically provides that second degree murder is a first degree felony punishable by life imprisonment.

White's forty-six year sentence fell within the permissible sentencing range under Florida law, and the court was authorized to enter it without making any factual findings. As White fails to show that the court imposed a "departure sentence" based upon facts not found by a jury, he has not established any constitutional violation.  Because he does not show that the state court's decision was contrary to or an unreasonable application of

clearly established federal law, White is not entitled to relief on Ground Nine.

Any claims not specifically addressed herein have been determined to be without merit.

Accordingly, it is **ORDERED** that:

1. White's petition for writ of habeas corpus (Dkt. 1) is **DENIED**. The Clerk is directed to enter judgment against White and to close this case.

2. White is not entitled to a certificate of appealability (COA). A petitioner does not have absolute entitlement to appeal a district court's denial of his habeas petition. 28 U.S.C. § 2253(c)(1). A district court must first issue a COA. *Id.* "A [COA] may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right." *Id.* at § 2253(c)(2). To make such a showing, White "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4 (1983)). White has not made this showing. Finally, because White is not entitled to a COA, he is not entitled to appeal *in forma pauperis*.

**ORDERED** in Tampa, Florida, on March 29, 2017.


Charlene Edwards Honeywell
United States District Judge

Copies to:
David Andrew White
Counsel of Record